1  ROBERT M. YASPAN, SBN 051867
2  DEBRA R. BRAND, SBN 162285
   LAW OFFICES OF ROBERT M. YASPAN
3  21700 Oxnard Street, Suite 1750
   Woodland Hills, CA  91367
4  Telephone:  (818) 774-9929
   Facsimile: (818) 774-9989
5
6  General Counsel for Debtor

7

8                    UNITED STATES BANKRUPTCY COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
                     SAN FERNANDO VALLEY DIVISION
10
11  In re                          )  Chapter No.:   11
                                   )
12  PACIFIC CENTREX SERVICES, INC.,  )  Bk. Case No.: 1:09-bk-17942
    a California Corporation, dba PSC1,  )
13                                 )  DISCLOSURE STATEMENT TO
14          Debtor.                )  PLAN OF REORGANIZATION SUBMITTED
                                   )  BY DEBTOR
15  _____)

16                                 [DISCLOSURE STATEMENT HEARING]

17                                 Date:   October 20, 2010
18                                 Time:  10:00 A.M.
                                    Place: Courtroom 302
19                                        21041 Burbank Blvd.
                                          Woodland Hills, CA 91367
20

21
22                                 [PLAN CONFIRMATION HEARING]

23                                 Date:
    Time:  10:00 A.M.
24                                  Place: Courtroom 302
                                          21041 Burbank Blvd.
25                                        Woodland Hills, CA 91367
26

27

28

**TABLE OF CONTENTS**

I.   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . .   4
     A.   Purpose of This Document . . . . . . . . . . . . .   5
     B.   Deadlines for Voting and Objecting; Date of Plan
          Confirmation Hearing . . . . . . . . . . . . . . .   6
          1.   Time and Place of the Confirmation
               Hearing . . . . . . . . . . . . . . . . . . .   6
          2.   Deadline for Voting For or Against the
               Plan . . . . . . . . . . . . . . . . . . . . .   6
          3.   Deadline for Objecting to the Confirmation
               of the Plan . . . . . . . . . . . . . . . . .   7
          4.   Identity of Person to Contact for More
               Information Regarding the Plan . . . . . . .   7
     C.   Disclaimer . . . . . . . . . . . . . . . . . . . .   7

II.  **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . .   8
     A.   Description and History of the Debtor's
          Business . . . . . . . . . . . . . . . . . . . . .   8
     B.   Principals/Affiliates of Debtor's Business . . . .   8
     C.   Management of the Debtor Before and After the
          Bankruptcy . . . . . . . . . . . . . . . . . . . .   9
     D.   Events Leading to Chapter 11 Filing . . . . . . .   9
     E.   Significant Events . . . . . . . . . . . . . . . .  10
          1.   Bankruptcy Proceedings . . . . . . . . . . .  10
          2.   Other Legal Proceedings . . . . . . . . . . .  12
          3.   Actual and Projected Recovery of
               Preferential or Fraudulent Transfers . . . .  12
          4.   Procedures Implemented to Resolve Financial
               Problems . . . . . . . . . . . . . . . . . .  12
          5.   Current and Historical Financial
               Conditions . . . . . . . . . . . . . . . . .  13

III. **SUMMARY OF THE PLAN OF REORGANIZATION** . . . . . . . . .  13
     A.   What Creditors and Interest Holders Will Receive
          Under the Proposed Plan . . . . . . . . . . . . .  13
     B.   Unclassified Claims . . . . . . . . . . . . . . .  14
          1.   Administrative Expenses . . . . . . . . . . .  14
          2.   Priority Tax Claims . . . . . . . . . . . . .  15
     C.   Classified Claims and Interests . . . . . . . . .  16
          1.   Classes of Secured Claims . . . . . . . . . .  18
          2.   Classes of Priority Unsecured Claims . . . .  18
          3.   Classes of General Unsecured Claims . . . . .  18
          4.   Class(es) of Interest Holders . . . . . . . .  20
     D.   Means of Effectuating the Plan . . . . . . . . . .  21
          1.   Funding for the Plan . . . . . . . . . . . .  21
          2.   Post-Confirmation Management . . . . . . . .  21
          3.   Disbursing Agent . . . . . . . . . . . . . .  21
     E.   Risk Factors . . . . . . . . . . . . . . . . . . .  22
     F.   Other Provisions of the Plan . . . . . . . . . . .  23
          1.   Executory Contracts and Unexpired Leases . .  23
               a.   Assumptions . . . . . . . . . . . . . .  23
               b.   Rejections . . . . . . . . . . . . . . .  23

G.  Changes in Rates Subject to Regulatory. . . . . . .  24
H.  Retention of Jurisdiction. . . . . . . . . . . . . .  24
I.  "Cure" Matters . . . . . . . . . . . . . . . . . . .  25
J.  Tax Consequences of Plan . . . . . . . . . . . . . .  25

IV.  CONFIRMATION REQUIREMENTS AND PROCEDURES . . . . . . .  25
     A.  Who May Vote or Object . . . . . . . . . . . . .  26
         1.  Who May Object to Confirmation of the
             Plan . . . . . . . . . . . . . . . . . . . .  26
         2.  Who May Vote to Accept/Reject the Plan . . .  26
             a.   What is an Allowed Claim/Interest . . .  27
             b.   What Is an Impaired Claim/Interest . . .  27
         3.  Who is Not Entitled to Vote . . . . . . . . .  28
         4.  Who Can Vote in More Than One Class . . . . .  29
         5.  Votes Necessary to Confirm the Plan . . . . .  29
         6.  Votes Necessary for a Class to Accept the
             Plan . . . . . . . . . . . . . . . . . . . .  29
         7.  Treatment of Nonaccepting Classes . . . . . .  29
         8.  Request for Confirmation Despite Nonacceptance
             by Impaired Class(es) . . . . . . . . . . . .  30
     B.  Liquidation Analysis . . . . . . . . . . . . . .  30
     C.  Feasibility . . . . . . . . . . . . . . . . . . .  33

V.   EFFECTS OF CONFIRMATION OF PLAN . . . . . . . . . . .  35
     A.  Discharge . . . . . . . . . . . . . . . . . . . .  35
     B.  Revesting of Property in the Debtor . . . . . . .  35
     C.  Modification of Plan . . . . . . . . . . . . . . .  36
     D.  Post-Confirmation Status Report . . . . . . . . .  36
     E.  Quarterly Fees . . . . . . . . . . . . . . . . . .  37
     F.  Post-Confirmation Conversion/Dismissal . . . . . .  37
     G.  Final Decree . . . . . . . . . . . . . . . . . . .  37

VI.  SUPPORTING DECLARATIONS . . . . . . . . . . . . . . .  39

     EXHIBIT 1 - LIST OF ALL ASSETS . . . . . . . . . . . .  40
     EXHIBIT 2 - LIST OF UNSECURED LIABILITIES (other than ATT) 41
     EXHIBIT 3 - LIST OF UNSECURED LIABILITIES CLAIMED BY ATT  42
     EXHIBIT 4 - FINANCIAL HISTORY (2006-2008) . . . . . .  43
     EXHIBIT 5 - FINANCIAL HISTORY (IN CHAPTER 11) . . . .  44
     EXHIBIT 5A- STIPULATION WITH TOYOTA MOTOR CREDIT . . .  45
     EXHIBIT 6 - UNEXPIRED LEASES TO BE ASSUMED . . . . . .  46
     EXHIBIT 7 - EXECUTORY CONTRACTS TO BE ASSUMED . . . .  47
     EXHIBIT 8 - LIQUIDATION ANALYSIS (includes analysis
                 Of administrative expense claims) . . . . .  48
     EXHIBIT 9 - LIST OF PRIORITY UNSECURED CLAIMS . . . .  49
     EXHIBIT 10 - LIST OF EQUITY INTEREST HOLDERS . . . . .  51
     EXHIBIT 11 - THREE YEAR PROJECTIONS . . . . . . . . .  52

**I**

**INTRODUCTION**

Pacific Centrex Services, Inc., a California corporation ("Debtor", or "Proponent") is the Debtor in a Chapter 11 bankruptcy case. On June 26, 2009, the Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. § 101 et seq., Chapter 11 allows the Debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.(the "Plan"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a reorganizing plan that contemplates the reorganization of the Debtor. In other words, the Proponent seeks to accomplish payments under the Plan by collecting monies that are allegedly due to it, and that are described more completely in this document – the Disclosure Statement to the Plan of Reorganization, (the "Disclosure Statement").

The Effective Date of the proposed Plan is the first day of the first month after which the order confirming the Plan has become final.

## A.   Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)   WHO CAN VOTE OR OBJECT,

(2)   WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

(3)   THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)   WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

(5)   WHAT IS THE EFFECT OF CONFIRMATION, AND

(6)   WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court

("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.    Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, at __ A.M in Courtroom 30_, located at 21041 Burbank Blvd., Woodland Hills, CA 91367.

**2.    Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to:

> ROBERT M. YASPAN, ESQ.
> LAW OFFICES OF ROBERT M. YASPAN
> 21700 Oxnard Street, Suite 1750
> Woodland Hills, CA  91367
> Telephone:  (818) 774-9929
> Facsimile: (818) 774-9989

Your ballot must be received by _____ or it will not be counted.

**3.    Deadline For Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served upon Robert M. Yaspan, at the above address, by _____.

**4.    Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the factual bases of this Plan, and the business operations of the Debtor, should contact Devin Semler at (818)-623-2300x1100 during normal business hours; any party desiring information on the legal issues surrounding the Plan should contact Mr. Yaspan at the above address and telephone number.

**C.    Disclaimer**

The financial data relied upon in formulating the Plan is based on the records of the Debtor, as prepared by the Debtor, and its bookkeepers and accountants.  The information contained in this Disclosure Statement is provided by, or under the supervision of, Devin Semler, whose business telephone number is as set forth above. The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

Nothing of a financial nature contained herein has been prepared by Counsel for the Debtor; such counsel has used his best efforts to prepare this Disclosure Statement but specifically

1  informs the creditors, and other interested parties that he has not

2  independently conducted any "due diligence", verified, or reviewed

3  as to accuracy, the summaries of the financial records contained

4  herein.  Any representations herein are, therefore, not those of

5  counsel, and should not be relied upon as such.

6

7  <center>II.</center>

8  <center>**BACKGROUND**</center>

9  **A.   Description and History of the Debtor's Business**

10      The Debtor is a California corporation that has been in the

11  business of providing telecommunications services to small and

12  medium businesses in the United States.  Its business consists

13  primarily of purchasing certain services offered by larger

14  telecommunications carriers and offering them to the public at a

15  market.  The Debtor is known in the industry as an "CLEC", or

16  competitive local exchange carrier.

17      The company offers local and long distance services, as well as

18  voice mail, toll-free, travel cards, voice messaging, ISDN/DSL

19  Internet access, and unified messaging services.

20      The company, as are other CLEC's, are carriers that provide

21  competition to the big national voice and data carriers, and as such

22  earns its revenues by working in the middle ground between the

23  wholesale costs that it must pay versus the retail revenues that it

24  seeks to achieve.

25

26  **B.   Principals/Affiliates of Debtor's Business**

27      The shares of stock in the company are owned by Devin Semler

28  (90%); and Subash Khurana (10%).  Previously, and through 2008, Ron

<center>8</center>

1  Semler (the father of Devin Semler) had owned a substantial minority
2  position in the company.

3  At the present time, certain Trusts as to which Ron Semler, or
4  his direct family, are beneficiaries, are the major secured
5  creditors of the Debtor.  The Semler Trusts contend that
6  approximately $3.9 million is due and owing to them from the Debtor.

7  Absent the provisions of the Plan, the Debtor is in default
8  with the obligation owing to the Semler Trusts.

9  **C.    Management of the Debtor Before and After the Bankruptcy**
10  Devin Semler

11  **D.    Events Leading to Chapter 11 Filing**

12  The filing of the case was precipitated by the threat of AT&T
13  to cancel its contracts with the Debtor as the result of an
14  allegedly due and unpaid $2 million bill for services rendered.
15  Other than the subject billing the Debtor was current on the
16  billings from AT&T to itself.

17

18

19  The $2 million bill was first presented on a retroactive basis,
20  i.e., AT&T sent a bill in 2008 for services rendered months and
21  years earlier.  The reason for the delay, according to AT&T, was
22  that it had only recently been allowed to retroactively increase its
23  billing rates for the affected calls.

24  While the Debtor disputed the basis for the retroactive charge,
25
26  and instituted litigation in the Orange County Superior Court for
27  the purpose of contesting the charge, the state court had denied the

28

prefiling Debtor's request for a restraining order preventing AT&T from cancelling its agreements with the Debtor.

In response thereto the Debtor filed this Chapter 11 proceeding.

**E.    Significant Events During the Bankruptcy**

**1.    Bankruptcy Proceedings**

The following is a chronological list of significant events which have occurred during this case:

1.    The Court has approved the employment of the following professionals:

Robert M. Yaspan has been employed as General Counsel for the Debtor, on a general retainer retroactive to the inception of this case.  The Order approving the employment of counsel was entered on July 20, 2009.

Solomon, Ross, Grey and Company was hired as the company's Certified Public Accountant.  Its order was entered on September 9, 2009.

Annette Peterfy and Joseph Fischbach were hired as Special Counsel to the Debtor for the purpose of bringing an action against City National Bank related to the Bank's refusal to loan monies to the Debtor in the prefiling period of time.  Said Special Counsel were employed as of August 26, 2010.

2.    The following significant adversary proceedings and motions were filed and, as described, are currently pending:

A.    AT&T:  The Debtor has filed an action against Pacific Bell Telephone dba AT&T California for declaratory relief as to whether

1   or not it has a duty to pay the "retroactive billing" described

2   above in the amount of $2 million, plus or minus.  The action is

3   still in the pleading stage.  If the Debtor prevails then the $2

4   million retroactive billing claim will be rendered null and void.

5   If AT&T prevails, then the claim against the Debtor will have a

6   significant effect on the probability of success of this Plan of

7   Reorganization, as the amounts due are quite probably greater than

8   the Debtor's ability to pay.

9       B.   USAC – The Debtor has been the subject of a Motion by

10  Universal Service Administration Company regarding the payment of

11  administrative payments to this semi-governmental entity.  USAC

12  obtained a $30,000, plus or minus, judgment against the Debtor

13  (which the Debtor has paid) and an Order requiring the Debtor to pay

14  $10,000 in attorneys fees.

15      C.   Jin Ra – The Debtor obtained a judgment against Mr. Ra and

16  his company (EKC Telecom, Inc.) in the approximate amount of

17  $337,137.  Collection proceedings are continuing.

18      D.   City National Bank – The Debtor sued City National Bank

19  for damages resulting from the Bank's alleged failure to follow

20  through, and consummate, a loan to the Debtor after an initial

21  approval therefor.  The Debtor contends that it was damaged by the

22  failure of the Bank to live up to its promise, which failure left it

23  vulnerable to the claims of AT&T.

24

25      E.   Toyota – The Debtor restructured its relationship with

26  Toyota and negotiated a reduction in the debt down to the fair

27  market value of the automobiles.  The Debtor is current on the post-

28  filing obligations set up by the agreement.

**2.    Other Legal Proceedings**

In addition to the proceedings discussed above, the Debtor is currently involved in the following nonbankruptcy legal proceedings: None.

**3.    Actual and Projected Recovery of Preferential or Fraudulent Transfers**

The Debtor has investigated whether or not preference claims exist.  For the most part they do not exist because the Debtor was on a "cash basis" for the preference statute of limitations (90 days before the filing for outside trade creditors).  Thus, payment was contemporaneous with receipt of consideration.  This does not mean that there are no preferential payments; just that the amounts are so small that it would not be an economic use of resources to pursue them.

As to the insiders, monies were paid to the insiders but primarily in connection with their roles as employees.  Thus, the payments were contemporaneous with services rendered.

As for fraudulent transfers, the investigation did not show that any such transfers were made over the relevant statute of limitations.

**4.    Procedures Implemented to Resolve Financial Problems**

To attempt to fix the problems that led to the bankruptcy filing the Debtor took the following actions:  (a) The Debtor streamlined its operations and cut its costs as much as possible; (b) the Debtor restructured its relationship with Toyota Motors Credit Corporation; and (c) the Debtor restructured its relationship

1 with the Semler secured creditors so that it could afford to pay

2 back the loan on a reasonable cash flow basis.

3 **5.   Current and Historical Financial Conditions**

4 The Debtor's operating cash flow in the Chapter 11 proceeding

5 has continuously been profitable. However, the profits have not

6 been significant as a percentage of revenues and, therefore, the

7 Debtor's ability to propose a Plan has been limited.

8 The identity of the estate's assets are listed in Exhibit "1".

9 An explanation of how the Debtor values those assets is contained at

10 Exhibit "8".

11 Note: The summary list of the Debtor's liabilities are attached

12 as Exhibits "2" and "3".

13 The Debtor's financial history for 2006, 2007 and 2008 is

14 attached hereto as Exhibit "4". The Debtor's operating results

15 during the Chapter 11 proceeding are also attached at Exhibit "5".

16 These documents were prepared internally by the Debtor and are

17 not audited.

18

19 **III.**

20 **SUMMARY OF THE PLAN OF REORGANIZATION**

21

22 **A.   General Overview of What Creditors and Interest Holders will**

23 **receive under the Proposed Plan**

24 As required by the Bankruptcy Code, the Plan classifies

25 claims and interests in various classes according to their right

26 to priority of payments as provided in the Bankruptcy Code. The

27 Plan states whether each class of claims or interests is impaired

28 or unimpaired. The Plan provides the treatment each class will

1  receive under the Plan.

2  **B.    Unclassified Claims**

3      Certain types of claims are not placed into voting classes;

4  instead they are unclassified. They are not considered impaired

5  and they do not vote on the Plan because they are automatically

6  entitled to specific treatment provided for them in the

7  Bankruptcy Code. As such, the Proponent has not placed the

8  following claims in a class.  The treatment of these claims is

9
10  provided below.

11      **1.    Administrative Expenses**

12      Administrative expenses are claims for costs or expenses of

13  administering the Debtor's Chapter 11 case which are allowed under

14  Code Section 507(a)(1).  The Code requires that all

15  administrative claims be paid on the Effective Date of the Plan

16  unless a particular claimant agrees to a different treatment.  The

17  following chart lists <u>all</u> of the Debtor's § 507(a)(1) administrative

18
19  claims and their treatment under this Plan.

20

21      1.    Law Offices of Robert M. Yaspan - Approximately $80,000;

22  paid in full on the Effective Date.

23
24      2.    Court fees - estimated at $500; paid in full on the

25  Effective Date.

26      3.    Office of US Trustee Fees - $4,850; paid in full on the

27  Effective Date.

28      4.    Claims incurred in the regular course of business will be

paid in the regular course of business, and not necessarily from the

account of the Disbursing Agent appointed under this Plan.

Court Approval of Fees Required:

The Court must approve all legal and professional fees listed .

For all fees except Clerk's Office fees and U.S. Trustee's fees, the

professional in question must file and serve a properly noticed fee

application and the Court must rule on the application.   Only the

amount of fees allowed by the Court will be required to be paid

under this Plan.

2.    **Priority Tax Claims**

Priority tax claims are certain unsecured income, employment and

other taxes described by Code Section 507(a)(8).   The Code requires

that each holder of such a 507(a)(8) priority tax

claim receive the present value of such claim in deferred cash

payments, over a period not exceeding five years from the date of

the filing of this Chapter 11 petition.

The following chart lists <u>all</u> of the Debtor's Section507(a)(8)

priority unsecured tax claims and their treatment under this Plan.

Los Angeles County Tax Collector - $765,865.79

Treatment: The allowed amount of this claim will be paid over a

period of time, in equal monthly installments, not exceeding the

maximum repayment period provided for in Section 1129 of the

Bankruptcy Code for unsecured prefiling tax claims. Interest shall

accrue on these claims at 4% interest per annum.

1    Note: The Debtor disputes the amount of this claim.  Thus, the

2    allowed amount may be different than the claimed amount:

3    California State Board of Equalization - $112,278,39

4

5    Treatment: The allowed amount of this claim will be paid over a

6    period of time, in equal monthly installments, not exceeding the

7    maximum repayment period provided for in Section 1129 of the

8    Bankruptcy Code for unsecured prefiling tax claims. Interest shall

9    accrue on these claims at 4% interest per annum.

10

11    Note: The Debtor disputes the amount of this claim.  Thus, the

12    allowed amount may be different than the claimed amount.

13    California Franchise Tax Board - $836.60.

14    Treatment: The allowed amount of this claim will be paid in

15    full on the Effective Date.

16

17    Internal Revenue Service - $14,961.

18    Treatment: The allowed amount of this claim will be paid over a

19    period of time, in equal monthly installments, not exceeding the

20    maximum repayment period provided for in Section 1129

21    of the Bankruptcy Code for unsecured prefiling tax claims. Interest

22    shall accrue on these claims at 4% interest per annum.

23

24    Note: The Debtor may dispute the amount of this claim.  Thus,

25    the allowed amount may be different than the claimed amount.

26    **C.   Classified Claims and Interests**

27

28

Secured claims are claims secured by liens on property of the estate. The following chart lists all classes containing Debtor's secured pre-petition claims and their treatment under this Plan:

## 1.   Classes of Secured Claims

CLASS 1.1   Ronald H. and Lisa Semler Trust: Amount of Claim: Approximately a principal balance of $2,733,000, plus applicable interest, as allowed.   The claimant has filed a Proof of Claim in the amount of $3,859,819.18, including principal, interest, fees and costs. The Debtor may object to the amount, but not the priority or security, of this claim.

Security: All of the personal property assets of the Debtor.

Treatment of Creditor: This creditor is deemed to be secured as the value of the property securing the debt is greater than the Debt owing against it. Payments will be made on this secured claim as follows: (1) $20,480 per month, principal and interest inclusive, until paid in full; (2) Interest shall accrue from the Petition Date through payoff at the rate of 6% per annum.

The existing security documents shall be amended to conform to the PLAN forthwith after the Effective Date.   Except as modified herein the existing note and security documents shall control.

The existing security interests shall be deemed to be valid and existing claims against the property of the Debtor as provided in the security documents.

Impairment: This Creditor is impaired.

CLASS 1.2 TOYOTA MOTOR CREDIT CORPORATION:  This creditor shall be treated as provided in that certain Stipulation approved by the Court as an "Agreed Order" on February 10, 2010, a copy of which is attached as Exhibit 5A hereto.

Impairment: This Creditor is impaired, but is deemed to have voted for the Plan.

**2.   Classes of Priority Unsecured Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claim.  The following chart lists all classes containing Debtor's 507(a)(3), (4), (5), (6), and (7) priority unsecured claims and their treatment under this Plan:

THERE ARE NO SUCH PRIORITY UNSECURED CLAIMS

**3. Classes of General Unsecured Claims**

**CLASS 2:   General Unsecured Claims (other than the claims of Pacific Bell, AT&T, and their affiliates)**

Amount of Claims: Approximately $4,472,000 (approximately 115 claimants)

Description:   This Class two contains the claims of those creditors (other than Pacific Bell, AT&T, and their affiliates) who do not have any priority under the Bankruptcy Code, or any security for their claims.

Treatment: The Debtor proposes to treat these claims as follows:   The Debtor will deposit the sum of $244,800 into a "pot" at the rate of $6,800 per month starting on the Effective Date (the "Pot").   This will take 36 months.   Allowed Class 2 Claims against the Pot shall be paid quarterly starting 75 days after the Effective Date, and continuing every 90 days thereafter (the "Pot Payment"). A claim that is partially or wholly disallowed shall only be paid based on the allowed amount of the claim.   Should a claim be under dispute at a time that a Pot Payment, the amount of the claim shall be estimated, and reserved against, pending the further order of the Court as to the amount of the allowable claim

**CLASS 3   General Unsecured Claims due to Pacific Bell, AT&T, and their affiliates**

Amount of Claim: $3,118,933.

Description: Prefiling  fees allegedly due to the wholesaler of communications services to the Debtor.   The claim consists of two

parts: (1) the sum of approximately $1 million relating to services rendered by the claimant immediately prior to the filing of the Chapter 11 petition, and (2) the sum of approximately $1.9 million relating to the retroactive billing of previously charged fees.  The Debtor disputes the claim.  As a part of the assumption of the alleged executory contract between the Debtor and the Creditor, the Debtor is required to cure any defaults on the executory contract, including those normally considered as general unsecured claims.

TREATMENT:     In return for the assumption of the executory contract, and at the time of the Order assuming the executory contract, the Debtor will on the Effective Date: (1) pay all sums, if any, due for administrative services to the Debtor; and (2) commence the paying of $12,500 in 36 equal monthly payments to the claimant on account of all prefiling amounts due.  Such sum will be deemed to be the "cure", as well, of any and all of the Debtor's obligations under Section 365 of the Bankruptcy Code.

Other than as set forth herein the executory contract between the Debtor and the claimants in this class shall remain in full force and effect.

These creditors are _impaired_.

**4.    Class(es) of Interest Holders**

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtor.  If the Debtor is a corporation, entities holding preferred or common stock in the

Debtor are interest holders.   If the Debtor is a partnership, the interest holders include both general and limited partners.   If the Debtor is an "LLC", then the members are the interest holders.

If the Debtor is an individual, the Debtor is the interest holder.

Class 5 (Interest Holders):   The current interest holders are: (a) Devin Semler (90%); and (b) Subash Khurana (10%).   At the time of the confirmation of the Plan of Reorganization, this interest will be cancelled and said interest holders will no longer be shareholders in the corporation.   In return for a total new capital infusion of $100,000, from the existing shareholders (the "NEW VALUE HOLDER"), such NEW VALUE HOLDER will receive newly-issued stock in the Debtor totaling 100% of the ownership in the Debtor.

The interest holders are <u>impaired.</u>

**D.   Means of Performing the Plan**

    **1.   Funding for the Plan**

The Plan will be funded by the following: (a) Funds in the debtor-in-possession accounts as of the Effective Date, (b) the future profitable business operations of the Debtor, and (c) the new value paid by the NEW VALUE HOLDER.

    **2.   Post-confirmation Management:** Devin Semler will serve as the Manager.

    **3.   Disbursing Agent:** Counsel for the Debtor, Robert M. Yaspan, shall act as the disbursing agent for the purpose of making

all distributions on the Effective Date as provided for under the

Plan.  All payments subsequent to the Effective Date shall be made

by Mr. Semler, who shall serve then as the Disbursing Agent.  The

Disbursing Agent shall serve without bond and shall not receive any

fee for distribution services rendered and expenses incurred

pursuant to the Plan (although costs will be paid as incurred).

**E.   RISK FACTORS**

The following risk factors may be important in reaching a

decision to vote, or not to vote, in favor of the Plan:

1.   The economy may not improve over the life of the

Plan.  In fact, there may be a double dip recession and the Debtor's

typical customers, i.e., cel telephone users, may well begin to view

such devices as luxuries.  The Plan calls for increasing payments

(over the administrative expenses) to be made.  It is possible that,

if the economy generally declines, or stays at its present depressed

level, the increase in payments will cause the Debtor to default on

the Plan.

2.   There may be an increase in competition.  Today, the

market for this business is fragmented.  Should the marketplace show

increased concentration then competition may increase accordingly.

This could lead to decreased business opportunities as national

chains seek, for example, national repair services.

3.   The Debtor's target market could continue to contract.

There are alternative electronic devices on the market now, or

coming onto the market that could impact the Debtor's penetration in

1  its chosen cel telephone market.  This could lead to increased cash

2  flow difficulties for this Debtor.

3      F.    Other Provisions of the Plan

4          1. Executory Contracts and Unexpired Leases

5          (a).    Assumptions

6

7      No executory contracts shall be assumed except for: (1) the

8  Agreement Between the Debtor, and Pacific Bell, AT&T, and its

9  affiliates; and (2) any and all real estate leases;    (3) That

10  certain Equipment Lease Agreement with Tamco Capital Corporation,

11  dated March 19, 2008 for certain software, for 60 months, at a

12  monthly payment of $1,858.66; (4) That certain Installment Payment

13  Agreement for financing of a software license, dated October 19,

14

15  2007, for 36 months, at a monthly payment of approximately $150; (5)

16  That certain Hasler Financial Services, LLC Lease Agreement, dated

17  January 28, 2009, for 60 months at a payment of $293 per month

18  relating to certain Hasler Equipment;  and (6)    That certain

19  Master Lease Agreement Number 456857 for an ADT/Camera System, dated

20  February 20, 2007, for 36 months, at a payment of $333.36 per month.

21

22          (b)  Rejections

23      All other executory contracts shall be rejected.  It is not

24  believed that there are any.

25

26      The order confirming the Plan shall constitute an order

27  approving the rejection of the lease or contract.  If you are a

28  party to a contract or lease to be rejected and you object to the

rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Disclosure Statement for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT HAS NOT YET BEEN SET .   Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**G.     Changes in Rates Subject to Regulatory Commission Approval**

This Debtor is not subject to governmental regulatory commission approval of its rates.

**H.     Retention of Jurisdiction.**

The Court will retain jurisdiction after the confirmation of this Plan of Reorganization: (a) to the extent provided by law; (b) to the extent provided for in this Plan, so long as it is not inconsistent with the law; (c) to hear, determine and decide any avoiding powers litigation filed by the Debtor prior to the entry of the order confirming this Plan; and (d) to hear, determine and decide any litigation presently pending, including all unsettled adversaries, newly filed adversaries (if any) and appeals from contested matters (if any), and (e) to interpret and enforce the terms of the Plan.

I.   "CURE" MATTERS: Upon the oral order of this COURT confirming the PLAN  (1) the executory contract with Pacific Bell, AT&T, and its affiliates shall be assumed, (2) the Debtor shall be deemed to have cured any defaults with respect thereto as of the Effective Date, and (3) the Debtor shall be deemed to have given adequate assurances of future performance.

J.   **Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action:

The Debtor is a subchapter "S" corporation and, as such is a pass-through entity for purposes of recognizing tax gain or loss. It is not anticipated, therefore, that the Debtor will recognize any income tax to be paid either under either California or federal law. Any such tax implications would be suffered, or enjoyed as the case may be, by the shareholders of the Debtor.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN

SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON
CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.

The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic. Nor is counsel for the Debtor advising the creditors, or the Debtor, as to the appropriate treatment of the Plan under any other applicable law, including but not limited to the Internal Revenue Code, or applicable state tax law.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are not the only requirements for confirmation.

**A.    Who May Vote or Object**

**1.    Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.    Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### a.    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

OTHER THAN FOR, POSSIBLY, ANY GOVERNMENTALLY RELATED CLAIMS, AND CLAIMS BASED ON A REJECTION OF AN EXECUTORY CONTRACT, THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE HAS ALREADY PASSED.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

### b.    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised

1  of general unsecured claims is impaired if the Plan fails to pay the

2  members of that class 100% of what they are owed.

3      In this case, the Proponent believes that classes 1.1 - 1.4,

4  2.1-2.10, 4 and 5 are impaired and that holders of claims in each of

5  these classes are therefore entitled to vote to accept or reject the

6  Plan. The Proponent believes that Classes 1.5, 1.6. and 3 are

7  unimpaired and that holders of claims in each of these classes

8  therefore do not have the right to vote to accept or reject the

9  Plan.

10     Parties who dispute the Proponent's characterization of their

11  claim or interest as being impaired or unimpaired may file an

12  objection to the Plan contending that the Proponent has incorrectly

13  characterized the class.

14     **3.    Who is Not Entitled to Vote**

15     The following four types of claims are not entitled to vote:

16  (1) claims that have been disallowed; (2) claims in unimpaired

17  classes; (3) claims entitled to priority pursuant to Code sections

18  507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not

19  receive or retain any value under the Plan. Claims in unimpaired

20  classes are not entitled to vote because such classes are deemed to

21  have accepted the Plan. Claims entitled to priority pursuant to Code

22  sections 507(a)(1), (a)(2), and (a)(7) are not

23  entitled to vote because such claims are not placed in classes and

24  they are required to receive certain treatment specified by the

25  Code. Claims in classes that do not receive or retain any value

26  under the Plan do not vote because such classes are deemed to have

27  rejected the Plan.   EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED

28

ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF

THE PLAN.

### 4.   Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured

claim and in part as an unsecured claim is entitled to accept or

reject a Plan in both capacities by casting one ballot for the

secured part of the claim and another ballot for the unsecured

claim.

### 5.   Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan

unless (1) at least one impaired class has accepted the Plan without

counting the votes of any insiders within that class, and

(2) all impaired classes have voted to accept the Plan, unless the

Plan is eligible to be confirmed by "cramdown" on non-accepting

classes, as discussed later in Section {IV.A.8.}.

### 6.   Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan

when more than one-half (1/2) in number and at least two-thirds

(2/3) in dollar amount of the claims which actually voted, voted in

favor of the Plan.  A class of interests is considered to have

accepted the Plan when at least two-thirds (2/3) in amount of the

interest-holders of such class which actually voted, voted to accept

the Plan.

### 7.   Treatment of Non-accepting Classes

As noted above, even if all impaired classes do not accept the

proposed Plan, the Court may nonetheless confirm the Plan if the

non-accepting classes are treated in the manner required by the

Code.   The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."   The Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

This Plan is not a "cramdown" Plan and the party proposing this Plan will **not** ask the Court to confirm this Plan by cramdown on the impaired classes if any of these classes do not vote to accept the Plan.

The Debtor reserves the right to amend this Plan into a "cramdown" plan if it becomes necessary and desirable to do so.

**B.    Liquidation Analysis**

Another confirmation requirement is the "Best Interests Test", which requires a liquidation analysis.   Under the Best Interests Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here because this is, essentially, a liquidating Plan that will follow exactly what a Chapter 7 Trustee will be doing, anyway.  However, the Debtor will be doing it with less cost, and quicker.  For these reasons, the creditors will be better off.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation.  (See Exhibit "8" for a detailed explanation of how the following assets are valued. This information is provided by the Debtor.)

**ASSETS VALUE AT LIQUIDATION VALUES:**

CURRENT ASSETS
a.    Cash on hand                                              $  805,000

| | | |
|---|---|---:|
| b. | Accounts receivable (FMV) | $2,300,000 |
| c. | Inventories | $ -0- |
| d. | Other Assets | $ 94,600 |
| e. | Amounts due from affiliate | $ 10,000 |

TOTAL CURRENT ASSETS

$3,115,000

FIXED ASSETS

| | | |
|---|---|---:|
| a. | Office furniture, machinery and equipment | |
| b. | Machinery & equipment | $3,870,000 |
| c. | Trucks | $ -0- |
| d. | Building & Land | $ 55,000 |
| | | $ -0- |

TOTAL FIXED ASSETS

$3,925,000

OTHER ASSETS

| | | |
|---|---|---:|
| a. | Customer list | $   -( |

TOTAL OTHER ASSETS                                      $   -0-
                                                       ==========

TOTAL ASSETS AT LIQUIDATION VALUE                      $ 7,040,600

Less:
Secured creditor's recovery (Toyota)
Secured creditor's recovery (Semler Trusts)           $     55,000
                                                      $  3,860,000

Less:
Chapter 7 trustee fees and expenses
                                                      $    250,000

Less:
Chapter 11 administrative expenses (Professionals)
Chapter 11 Trade creditor claims                      $    160,000
                                                      $  2,373,674
Chapter 11 administrative tax claims (current
portion)                                              $     90,000

Chapter 11 administrative loan
                                                      $      -0-
                                                      ==========
Less:
Priority claims (primarily prefiling tax claims)
                                                      $  1,008,316

Less:
Debtor's claimed exemptions (corporations do not have
exemptions)                                           $   -0-

Total Subtractions from Assets at Liquidation Value
                                                      $  7,796,990

  (1) Balance for unsecured claims
                                                          -0-

  (2) Total amount of unsecured claims ($7,872,000)
(including rejection claims of $100,000, est.)

Notes: (1) The Chapter 7 percentage is computed by deducting the Chapter 7 and Chapter 11 estimated claims amount.

(2) The Chapter 11 percentage excludes the Chapter 7 estimated expense amount.

(3) See Exhibit "6" for a discussion of the backup for the valuations given herein.

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WOULD RECEIVE
     OR RETAIN IN A CH. 7 LIQUIDATION: = __  0%**

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE
     OR RETAIN UNDER THIS PLAN:        =    3.2%
     (Excluding AT&T)**

**% OF THEIR CLAIMS WHICH AT&T WILL RECEIVE
     OR RETAIN UNDER THIS PLAN:        =   14.4%**

---

**C.   Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  Here, the liquidation of the Debtor is not sought as a part of the Plan, and thus the Debtor will not have any short-term or long term feasibility issues, as the Debtor will pay out everything that it has.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have

1   enough cash on hand on the Effective Date of the Plan to pay all

2   the claims and expenses which are entitled to be paid on such date.

3   The Plan Proponent maintains that this aspect of feasibility is

4   satisfied as illustrated here:

5

6   Cash Debtor will have on hand by Effective Date      $ 900,000
    (other than payment of "new value" for shares)

7                                                             - 110,000

8   **To Pay**: Administrative claims then outstanding
    (other than costs incurred in the regular course
    of business)

9                                                                -    1,500

10   **To Pay**: Statutory costs & charges

                                                             **–   30,800**

11   **To Pay**: Other Plan Payments due
            on Effective Date (*See note)

12                                                            **$ 757,700**

13   Balance after paying these amounts..............

14     *NOTE: The Plan payments estimated to be due on the Effective

15   Date are the result of the addition of the payments going to the

16   various classes of creditors.  Those payments are estimated as

17   follows:

18

19     The sources of the cash Debtor will have on hand by the

20   Effective Date, as shown above are:

21

22     $ 806,000     Cash in DIP Accounts now

23     +  95,900     Additional cash DIP will accumulate from

24                      net earnings, draws on the administrative

25                      line of credit, and litigation settlements,
                     between now and Effective Date

26     + 100,000     Payment by Class 5 Interest Holders for New

27                      Shares. For the identity of these holders
                     please see Exhibit "6".

28     +   -0-     Other

$1,001,900   **Total**

The second aspect of feasibility considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments.

The Proponent has provided financial statements which include historical information. Please refer to Exhibits "4" and "5" for the relevant financial statements.

In addition the Debtor has attached a three year projection during the course of the plan payments.  See Exhibit "11".

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.

<div align="center">

**V.**

**EFFECT OF CONFIRMATION OF PLAN**

</div>

**A.    Debtor to Receive Discharge**

The Debtor will receive a discharge in this case as specified in 11 U.S.C. Section 1141(d)(1).

**B.    Revesting of Property in the Debtor**

Except as provided in Section {V.E.}, and except as provided elsewhere in the Plan, the confirmation of the Plan vests all of the property of the estate in the Debtor free and clear of the claims of creditors, claimants and interest holders, subject to the terms and conditions of this Plan.

Subject to the terms of this Plan, the provisions of the Bankruptcy Code, and any stipulation attached as an exhibit to this Plan creditors whose claims are treated in this Plan shall be

enjoined upon the order of confirmation from proceeding against the re-vested debtor or the property of the re-vested debtor.

Except as provided in the Plan, or in the order confirming the Plan, after confirmation of the Plan the property dealt with by the plan is, and shall be, free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

## C.    Modification of Plan

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan if proponent modifies the plan before confirmation.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) if the Court authorizes the proposed modifications after notice and a hearing.

## D.    Post-Confirmation Status Report

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court, should it so order in the Order Confirming Plan, explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

**E.    Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be paid to the United States Trustee on or before the effective date of the plan.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

**F.    Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case.

**G.    Final Decree**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

///

1    Date: October 12, 2010

2

3                                      Pacific Centrex Services, Inc.

4

5

6                                      By: Devin Semler
                                       Chief Executive Officer
7

8    PRESENTED BY:

9    LAW OFFICES OF ROBERT M. YASPAN

10

11   By: Robert M. Yaspan
         Attorneys for Debtor
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.

### SUPPORTING DECLARATIONS

I, Devin Semler, being first duly sworn, declare and allege as follows:

1. I am the Chief Executive Officer of the Debtor.  I have personal knowledge of the facts set forth herein and if called as a witness I could, and would, so competently testify hereto.

2.  I have reviewed the Disclosure Statement and its exhibits. Some of the factual information contained therein has been derived from the Operating Reports filed with the Office of the United States Trustee, and much of the rest of the information has come from the books and records of the Debtor.

3.  The information contained in this Disclosure Statement and its exhibits fairly represent the financial position of the Debtor.

Executed at Los Angeles, California this 12th day of October, 2010.

I declare under penalty of perjury to the best of my knowledge, information and belief that the foregoing is true and correct under the laws of the United States of America and the State of California.

_____
Devin Semler